UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MUSLIM COMMUNITY
ASSOCIATION OF ANN ARBOR,

                    Plaintiff,                    Case No. 12-CV-10803

v.                                      Honorable Patrick J. Duggan

PITTSFIELD CHARTER TOWNSHIP,

                    Defendant.
_____/

## OPINION AND ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITHOUT PREJUDICE, and (3) DENYING WITHOUT PREJUDICE AS MOOT DEFENDANT'S MOTION TO LIMIT DAMAGES

## I.  INTRODUCTION

Defendant Pittsfield Charter Township ("the Township"), through its Planning Commission and Board of Trustees, denied a rezoning application submitted by Plaintiff Muslim Community Association of Ann Arbor, doing business as Michigan Islamic Academy ("MIA").  According to MIA, the denial of the rezoning application means that it cannot build a new Islamic school on property within Pittsfield Township that it wishes to utilize for that purpose.  MIA claims that the Township's decision to deny the rezoning application was based on hostility toward Islam, and asserts claims under the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* and the United States Constitution. MIA also brings pendent state law claims under the Michigan Constitution.

The sole remaining Defendant is Pittsfield Charter Township. The claims that remain are brought under: (1) RLUIPA's substantial burden clause; (2) RLUIPA's antidiscrimination clause; (3) RLUIPA's equal terms clause; (4) the Establishment Clause of the First Amendment to the United States Constitution and its Michigan Constitution counterpart; and (5) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and its Michigan Constitution counterpart.

On July 14, 2014, the Township moved for summary judgment and MIA moved for partial summary judgment. The Township seeks summary judgment on each of MIA's five remaining claims; MIA seeks summary judgment on only its claim under RLUIPA's substantial burden clause. Additionally, the Township filed a motion asking the Court to limit, as a matter of law, any damages to which MIA may be entitled in this lawsuit. The Township asks the Court to resolve its damages motion only if some of MIA's remaining claims survive the Township's summary judgment motion.

All three motions are fully briefed. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court will decide the motions without oral argument. For the reasons that follow,

the Court will grant the Township's motion for summary judgment subject to certain caveats, deny MIA's motion for partial summary judgment without prejudice, and deny as moot without prejudice the Township's motion to limit damages.

## II. BACKGROUND[1]

MIA is a school providing secular and Islamic religious education to preschool through twelfth grade students. MIA's current building is located in Ann Arbor, Michigan, in a 10,000-square-foot facility that MIA feels is inadequate to meet the school's current needs. Specifically, the space is too small to accommodate growing enrollment numbers, and there is no room for basic facilities such as a cafeteria, library, science lab, computer room, or an outdoor play area. To alleviate these space concerns and better accommodate its students, MIA began exploring expansion and relocation options.

MIA considered the possibility of expanding its current facility in 2009. However, MIA decided not to pursue expansion at that time after learning that expansion would be limited to a total building size of 13,496 square feet, which was still not deemed large enough to fully alleviate the space concerns prompting

---

[1] In lieu of detailing all pertinent background facts in this initial background section, the Court sets forth a general outline of the pertinent events that occurred leading up to this lawsuit and discusses additional facts later, as they become relevant to the legal issues discussed. As the background facts contained in this initial background section are undisputed, the Court dispenses with citations to the record.

the need for expansion.  MIA also considered buying and moving into the Ardis Elementary School in Ypsilanti, Michigan, but that idea did not materialize.

MIA then considered building a new school.  Tarek Nahlawi, an MIA board member at the time, led MIA's efforts to find a suitable tract of land on which to construct a new school.   Nahlawi located a parcel of property in Pittsfield Township ("the property").  The property, located at the intersection of Ellsworth Road and Golfside Drive, is approximately 26.7 acres in size, undeveloped, and zoned as a "planned unit development" ("PUD") under Article 45 of the Pittsfield Township Zoning Ordinance in effect at the time ("Township Zoning Ordinance").[2]

Specifically, the property is part of the "Silverleaf PUD," which was "approved in the early 1990s as a mixed housing project consisting of a single-family lot subdivision and single-family detached condominiums."  6/8/11 Revised PUD Area Plan Review (ECF No. 106-7 Page ID 1714).  In addition, the

---

[2] In general, PUDs

> permit flexibility in the regulation of land development, encourage innovation in land use and variety in design, layout, and type of structures constructed, achieve economy and efficiency in the use of land, natural resources, energy, and the provision of public services and utilities, encourage useful open space, and provide better housing, employment, and shopping opportunities particularly suited to the needs of the residents of this state.

Mich. Comp. Laws § 125.3503(2); *see also* Township Zoning Ordinance § 45.01 (ECF No. 111-12 Page ID 3094).

4

Township's general (master) development plan designates the property for "suburban residential use," which means that the property can "accommodate ancillary uses such as . . . small-scale churches and small-scale schools." *Id.* (Page ID 1721). The term "small-scale school" is not defined in the Township Zoning Ordinance.

Before purchasing the property, Issa Said met with Mandy Grewal, the Township's supervisor, to discuss the possibility of building a school and community center on the property. Said is a board member of Hidaya Muslim Community Association ("HMCA"), a domestic non-profit corporation whose purpose is to facilitate greater ties between the Islamic community and the secular community, thereby "opening up what Islam is really about through the community, rather than through media." Said Dep. at 8 (ECF No. 129 Page ID 5040). Said hoped to glean the Township's preliminary thoughts on the possibility of building a school and community center on PUD-zoned land within the Township. Said left the meeting with the impression that Grewal was in favor of the project and "invited the idea." *Id.* at 19-23 (Page ID 5011-55).

On September 13, 2010, following his meeting with Grewal, Said bought the property at a foreclosure sale for $260,000. Although Said bought the property in his own name, he later sold it to North American Investment Properties, LLC ("NAIP") for $1.00 and, on December 21, 2012, NAIP sold the property for $1.00

to HMCA.  HMCA presently owns the property.  MIA does not own, and has never owned, the property, although Said testified that MIA has "permission to utilize [the] property" to build a new school.  *Id.* at 62-63 (Page ID 5094-95).

After Said bought the property, MIA began the process of securing the approval of the Township's zoning authorities to build its school.  As mentioned, the property was zoned as a PUD.  In the view of Paul Montagno, the Township's senior planner, MIA "would have to . . . go through the rezoning process" because the property was zoned as a PUD district and PUDs "[do] not specifically allow for a school."  Montagno Dep. at 10 (ECF No. 189 Page ID 8332).  The Township's Zoning Ordinance sets forth the procedures for amending a PUD, differentiating between "major" changes and "minor" changes.  *See* Township Zoning Ordinance § 52.12 (ECF No. 111-12 Page ID 3121).  Requests for a major change, which is defined in pertinent part as a change to the "concept" or "character" of the development, *id.* § 52.12(C) (Page ID 3121), are initially reviewed by the Township's Planning Commission and subsequently approved or rejected by the Township Board of Trustees.  *Id.* §§ 52.07(A)(5)-(6), 52.12(A) (Page ID 3115-16, 3121).[3]  Requests for a minor change, by contrast, are decided by the Planning

---

[3] The Planning Commission is comprised of seven members, each of whom is appointed to a term of three years.  "The Planning Commission is responsible for developing the township master plan and the township zoning ordinance that protects and enhances the public health, welfare, and safety."  *Planning*

Commission alone.  *Id.* § 52.12(A) (Page ID 3121).  MIA's proposed change to the PUD was deemed a major change.

Major changes to a PUD must satisfy the eleven standards listed in § 52.07(C) of the Township Zoning Ordinance.   Under the Township Zoning Ordinance, the Planning Commission must undertake a study of the rezoning petition, hold a public hearing, consider evidence with regard to each of the eleven standards, and determine whether each standard is satisfied.  *See id.* § 52.07(A), (C) (Page ID 3115-16, 3118-19).  After doing so, the Planning Commission must submit a report to the Township Board of Trustees containing "the Planning Commission's analysis of the petition, findings regarding standards, suggested conditions of approval, if applicable, and its recommendation."  *Id.* § 52.07(A)(5) (Page ID 3116).  The Township Board of Trustees must then "review the petition and the reports . . . and shall approve or deny the petition."  *Id.* § 52.07(A)(6) (Page ID 3116).

---

*Commission*, PITTSFIELD CHARTER TWP. MICH., http://pittsfield-mi.gov/index.aspx?NID=124 (last visited Mar. 20, 2015).

The Township Board of Trustees is "an elected seven member board that governs Pittsfield Charter Township."  "The board is comprised of the three full-time administrative legislators: supervisor, clerk, and treasurer, along with four part-time legislative trustees who are each elected to serve a four year term, which coincides with the presidential election cycle."  *Board of Trustees*, PITTSFIELD CHARTER TWP. MICH., http://pittsfield-mi.gov/index.aspx?NID=118 (last visited Mar. 20, 2015).

In accordance with Montagno's view that MIA "would have to . . . go through the rezoning process" in order to build a school on the property, MIA submitted a petition for a zoning amendment on December 6, 2010, together with an area plan prepared by its site planner, David Kubiske of David Arthur Consultants, Inc.  However, MIA does not believe that it was required to seek an amendment to the PUD in order to build its school.  As mentioned, in addition to being zoned a PUD, which does not explicitly allow schools, the Township's general (master) development plan designates the property for "suburban residential use," which can accommodate "small-scale schools."  MIA believes that its proposed school qualifies as a "small-scale school," and that it was therefore unnecessary to pursue an amendment to the PUD.  However, MIA did not, at the time, oppose the Township's position that MIA was required to pursue an amendment to the PUD.  Rather, MIA followed the Township's instructions and submitted an amendment petition.

On January 5, 2011, a community planning firm employed by the Township, Carlisle/Wortman Associates, Inc. ("CWA"), prepared a "planned unit development amendment area plan review" in connection with MIA's petition for zoning amendment.  CWA's area plan notes that "[a] number of informational items are deficient" and that "the site location and layout raise concerns," and lists

seven items that should be addressed.  1/5/11 Area Plan (ECF No. 109-12 Page ID 2002).

The Planning Commission held meetings on MIA's petition on January 13, 2011 and February 17, 2011.  At the meetings, the Commission heard numerous comments from members of the public, both for and against MIA's petition.  The Commission also heard from Montagno and Kubiske, both of whom discussed various aspects of the project.  A reoccurring issue raised by members of the public, the Planning Commission, and the site planners was the possibility that a school at the contemplated location would exacerbate already significant traffic and congestion problems in the area.  At the end of the February 17 hearing, the Planning Commission decided to defer action on MIA's petition until after the submission of further information by MIA, including a traffic impact study.

MIA's site planner submitted a traffic impact study dated March 14, 2011, along with a revised area plan.  By letter dated March 29, 2011, the Planning Commission informed MIA that it would seek comment from the Washtenaw County Road Commission ("WCRC") on the study.  On April 1, 2011, Gary Straight, WCRC's permits and subdivision engineer, informed MIA that the study "is not approved at this time," raising several deficiencies with the study and inviting MIA to submit a revised study addressing the deficiencies.  4/1/11 Letter

(ECF No. 110-3 Page ID 2301).  MIA submitted a revised study dated April 11, 2011, which was subsequently approved by WCRC on April 18, 2011.

On April 13, 2011, CWA submitted a revised area plan.  The revised plan notes deficiencies with MIA's proposed area plan, and lists ten items that should be addressed.  On June 8, 2011, CWA submitted another revision to its area plan, this time noting that "the proposed project has been significantly improved" and listing five "comments [that] can be addressed at the next stage of site plan review."  6/8/11 Area Plan (ECF No. 106-7 Page ID 1723).

The Planning Commission discussed MIA's petition at its meeting on June 16, 2011.  MIA's site planner, David Kubiske, highlighted that WCRC approved MIA's revised traffic impact study and that traffic concerns were no longer an issue.  In addition, dozens of members of the public spoke for and against MIA's petition.   Many speaking against the petition continued to cite traffic and congestion concerns.  One member of the public stated that he "would just wish that everyone in this room could have pledged allegiance to the flag of the United States of America."  6/16/11 Meeting Minutes (ECF No. 112-23 Page ID 3722). One of the Planning Commissioners testified in her deposition that people in the audience applauded after this statement was made, a reaction that "floored" and "shocked" her, made her feel "ashamed to live in Pittsfield Township," and caused her to believe that "bias" may have motivated some of the public comments

10

opposing MIA's petition.  Harris Dep. at 70-71 (ECF No. 157 Page ID 6728-29).

Later in the meeting, the chairperson of the Planning Commission stated that

"[neither] Islam nor the character of the Michigan Islamic Academy is on trial

here" and urged members of the public to "speak more specifically to the issue"

and to "address their comments to the issue of the impact of the rezoning."

6/16/11 Meeting Minutes (Page ID 3725).

Also at this meeting, the Commissioners debated the merits of MIA's

petition, discussing (with input Montagno and Nahlawi) the eleven standards listed

in the Township Zoning Ordinance that must be satisfied before a major

amendment to a PUD can be approved.  By a 3-2 vote, the Planning Commissions

passed a motion to "postpone action" on MIA's petition and "direct staff to draft a

resolution recommending denial" of MIA's petition.  *Id.* (Page ID 3754-55).

The Planning Commission's final meeting on MIA's petition took place on

August 4, 2011.  At this meeting, like the prior meetings, numerous members of

the public spoke both in favor of, and in opposition to, the petition.  In addition,

Montagno and Nahlawi were present to answer the questions of the Planning

Commissioners, Kubiske addressed various site planning concerns, and MIA's

attorney, Lena Masri, addressed the legal considerations that MIA deemed

pertinent to the decisionmaking process of the Planning Commission, along with

11

MIA's position on the eleven standards that must be satisfied to amend a PUD. 8/4/11 Meeting Minutes (ECF No. 110-15 Page ID 2619).

Following Masri's presentation, the Planning Commissioners discussed the merits of the petition and the eleven requirements for a PUD amendment. The Commissioners discussed, and voted on, each of the eleven requirements one-by-one. One of the eleven standards requires that "[t]he proposed development shall conform to the adopted general development plan." Township Zoning Ordinance § 52.07(C)(1) (Page ID 3118). As part of the analysis on this requirement, the Planning Commission discussed whether MIA's proposed school qualified as a "small-scale school," ultimately concluding by a 3-2 vote that it does not. The Planning Commission reasoned that MIA's school would not be a "neighborhood school," but rather one with "a regional draw" where students would be "primarily bussed or driven in from different areas." 8/4/11 Meeting Minutes (Page ID 2652). The meeting minutes reflect that one of the Planning Commissioners agreed with this finding, one disagreed with it, and one questioned whether "small-scale" should be defined based the residence of the students and stated that she "would like to see a definition of small scale." *Id.*

By a final vote of 3-2, the Planning Commission recommended to the Township Board of Trustees that MIA's petition be denied.[4] The Township Board of Trustees, at a meeting on October 26, 2011, voted 7-0 to adopt the Planning Commission's recommendation to deny MIA's rezoning petition.

Deborah Williams was one of the three Planning Commissioners who voted to recommend denial of MIA's petition. Williams lived in the neighborhood in which MIA proposed to build its school and was vehemently opposed to MIA's petition, so much so that she took it upon herself to both inform community members about MIA's petition and actively encourage them to oppose it. Williams admitted in her deposition that she went from house to house in February 2011, "knock[ing] on doors," distributing to residents living near the site of MIA's proposed school a letter opposing MIA's petition. Williams Dep. at 34-35 (ECF No. 154 Page ID 6440-41).[5] About four months later, Williams emailed area

---

[4] Although there are seven members of the Planning Commission, only five voted because two were absent at the August 4 meeting.

[5] The letter reads:

PROPOSED SCHOOL AT THE CORNER OF ELLSWORTH AND GOLFSIDE

I am writing to inform you that a group is trying to put a 200-400 child school on Ellsworth, across from Oak Dr., kitty corner from the 400 member school of Fortis Academy at the light at the intersection of Ellsworth and Golfview. At the Planning Commission meeting 3 weeks ago, when this was on the agenda, 25 neighbors showed up in

13

residents expressing the same sentiments and again encouraging the public to

oppose MIA's petition.[6]   Williams went a step further, as well; she coached

---

> opposition, so the Planning Commission voted no.  However, this
> group, the Michigan Islamic Academy is determined to get their
> school in that location.  They showed up en masse at last night's
> meeting, pretty much the whole school, to encourage the Planning
> Commission to reverse course, and allow them to do a traffic study
> and change anything wanted [sic] so that this land could be rezoned
> for their school.
>
> The Planning Commission changed and voted to let them do a Traffic
> study and work with the Planning Dept. for a plan pleasing to all.  If
> we don't oppose this, we will have this school put here as this group
> will keep pushing for it.  I am not opposed to an Islamic school, per
> se, just any school at this very busy corner.
>
> I am looking for neighbors who oppose having another school at this
> corner, to email/write a note to the Planning Commission at:
> pcsupport@pittsfield-mi.gov.
>
> Urge the Planning Commission to listen to the homeowners here and
> keep this property residential, rather than re-zone it to allow a school.
>
> Thanks, Debbie Williams
> williamsj@provide.net

First Undated Letter of Williams (ECF No. 191 Page ID 8464).

[6] In the second letter, Williams stated that "4 MIA folks attended and spoke" in
favor of the petition at the Planning Commission's June 16, 2011 meeting, but that
"[t]hankfully, my husband, Jeff Williams, also attended and spoke" in opposition
to the petition.  Williams also noted that "[b]ecause the previous vote was so close
(3 to deny, and 2 to allow), it is very important to let neighbors and friends know to
attend this meeting, if they are opposed to having a school on this property."
Williams concluded by encouraging those opposed to the petition to make their
opposition known: "If you know anyone who is opposed to the school . . . please
encourage them to write an email (or another email) to the Planning Commission

community members on how to effectively oppose the petition by sharing specific talking points and arguments opposing the petition, attempted to create public hostility towards MIA's project, and urged others to adopt her views regarding the merits of MIA's petition.[7]

MIA brought this lawsuit on February 22, 2012. As stated, the statutory claims that remain are brought under RLUIPA's substantial burden, equal terms, and nondiscrimination provisions, and the constitutional claims that remain are brought under the Establishment and Equal Protection Clauses.

MIA alleges that the Township denied it the zoning authorization necessary to build its school out of hostility for Islam and, in doing so, substantially burdened the religious exercise of MIA and its students. MIA further alleges that the Township treated other entities, both religious and nonreligious, more favorably

(and the Township Board of Trustees as well)." Second Undated Letter of Williams (ECF No. 192 Page ID 8465).

[7] The record contains numerous emails written by Williams sent to various members of the community. Williams Emails (ECF No. 203 Page ID 9848-64). In one email, Williams told a community member that MIA "ambushed" a Planning Commission meeting. In another, Williams told community members that MIA's school would "change the character of our neighborhoods even though a small scale school is 'technically' allowed in a residential district" and that "[w]e do not want the rezoning due to the noise levels of 360 extra students (small scale?) on top of the 750 already at Fortis Academy, the increased traffic burden, and the fact that more people will be cutting through the neighborhoods." *Id.* (Page ID 9851). And in another, Williams told community members that it "would be wise for some opposition to show up" at one of the Planning Commission meetings to prevent the Planning Commissioners from being "swayed into changing their vote." *Id.* (Page ID 9852).

than it treated MIA, thereby creating a preference for nonreligious entities and non-Islamic religious entities, by subjecting MIA's zoning request to more scrutiny and more hurdles than the zoning requests of nonreligious and non-Islamic religious entities.  On July 14, 2014, the Township filed its motion for summary judgment and MIA filed a motion for partial summary judgment.

### III.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

### IV.  ANALYSIS

### A.  RLUIPA Claims

As stated, the three statutory claims that remain are brought under RLUIPA's substantial burden provision, 42 U.S.C. § 2000cc(a)(1) (prohibiting governments from imposing "a land use regulation in a manner that imposes a

substantial burden on . . . religious exercise"), equal terms provision, *id.* § 2000cc(b)(1) (prohibiting governments from imposing "a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution"), and nondiscrimination provision, *id.* § 2000cc(b)(2) (prohibiting governments from imposing "a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination").

Under the language of the statute, the government's imposition of a "land use regulation" is a necessary component of all three asserted RLUIPA claims. A "land use regulation" is statutorily defined as

> a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land . . . if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5(5). Therefore, as the Seventh Circuit has recognized, RLUIPA land-use claimants must have some "legally recognized property interest" in the land at issue. *Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007).

In *Taylor*, the Seventh Circuit affirmed the dismissal of a claim under RLUIPA's substantial burden provision, holding that a city's decision to demolish part of a church situated on property it owed, instead of giving it to the RLUIPA plaintiff, a minister, was not a "land use regulation," as the minister lacked "any

17

legally recognized property interest in [the church]." *Id.* at 562. Other courts have similarly dismissed RLUIPA claims in situations where the plaintiff lacked a legally cognizable interest in the subject property. *See, e.g.*, *Congregation Etz Chaim v. City of Los Angeles*, No. 10-1587, 2012 WL 11826032, at *3 (C.D. Cal. Apr. 17, 2012) (synagogue's congregants lacked ability to bring RLUIPA land use claim where subject land was owned by synagogue and not congregants); *Covenant Christian Ministries, Inc. v. City of Marietta*, No. 06-CV-1994, 2008 WL 8866408, at *4 (N.D. Ga. Mar. 31, 2008) (church's pastor dismissed as plaintiff from RLUIPA land use case where subject land was owned by church and not pastor).

The Township argues that MIA has no legally cognizable interest in the property and it is therefore entitled to summary judgment on all three remaining RLUIPA claims.[8] Although MIA now admits that it does not own the property and

---

[8] The Township contends that, because MIA does not have a cognizable property interest, it lacks Article III standing to bring its RLUIPA claims. However, as the Second Circuit recently clarified, the issue is not one of Article III standing; it is one of "statutory standing," namely, "whether a statute grants a plaintiff a cause of action." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201-02 (2d Cir. 2014). MIA has Article III standing to bring its RLUIPA claims, as it has alleged that it cannot build its school due to the zoning actions of the Township – harm that this Court can redress.

has never owned the property, it argues that it has an interest in the property that is sufficient under RLUIPA's definition of "land use regulation."[9]

The evidence submitted by the parties reveals that the property was bought and sold three times between 2010 and 2014.  On September 13, 2010, Issa Said bought the property from the Federal Deposit Insurance Company at a foreclosure sale for $260,000.  Pittsfield Charter Township General Property Information (ECF No. 112-24 Page ID 3781).  On June 6, 2011, Issa Said and his wife sold the property for $1.00 to NAIP.  6/11/11 Warranty Deed (ECF No. 106-10 Page ID 1740).  Finally, on December 21, 2012, NAIP sold the property for $1.00 to HMCA.  12/21/12 Warranty Deed (ECF No. 106-10 Page ID 1742).  HMCA presently owns the property.

Although MIA does not own the property, this does not end the inquiry, as RLUIPA's definition of "land use regulation," 42 U.S.C. § 2000cc-5(5), makes clear that nearly any type of property interest will suffice so long as the interest is legally cognizable.  *See also* 42 U.S.C. § 2000cc-3(g) (mandating that the provisions of RLUIPA "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the

---

[9] In its second amended complaint, MIA states that it "purchased the subject property at a foreclosure auction on September 13, 2010, in the amount of $260,000."  Second Am. Compl. ¶ 47 (ECF No. 61 Page ID 816).  However, in its summary judgment papers, MIA does not take the position that it now owns, or has ever owned, the property.

19

Constitution"); *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015) (characterizing RLUIPA as an "expansive protection for religious liberty").  MIA contends that it has a sufficient interest in the property because it has "permission [from the owner] to utilize the property" to build a school.  MIA Resp. Br. at 90 (ECF No. 185 Page ID 8038).  The Court agrees that permission to utilize property certainly could suffice as a property interest, but only if the permission is conferred in a way that is recognized by the law.  *See Taylor*, 233 F. App'x at 562 (requiring RLUIPA land use claimant to have a "legally recognized property interest" in the land at issue).  Because the property at issue is located in Michigan, Michigan law will determine whether MIA's interest in the property is "legally recognized."

Under Michigan law, "[a] conveyance of an interest in land must be in writing and comport with the statute of frauds."  *Marina Bay Condos., Inc. v. Schlegel*, 167 Mich. App. 602, 606, 423 N.W.2d 284, 287 (1988).  The statute of frauds requires that a conveyance in an interest of land, other than a lease not exceeding one year, be in writing and signed by the grantor.  Mich. Comp. Laws § 566.106.  The record in this case contains no writing conveying any interest in the property to MIA.

MIA contends that it has a right to receive at least five acres of the property as a donation from NAIP and/or HMCA.  MIA relies on the March 3, 2014 deposition of Issa Said, who testified that MIA would receive at least five acres of

the property as a donation from the property owner, whether it be himself, NAIP, or HMCA, if MIA is permitted to build its school.  Said Dep. at 61-63 (ECF No. 129 Page ID 5093-95).  However, Said's testimony cannot confer on MIA an interest in the property.  *See Kitchen v. Kitchen*, 465 Mich. 654, 660, 641 N.W.2d 245, 250 (2002) ("[The statute of frauds precludes an oral promise from forming the basis of a claim to an interest in real property.").

MIA also relies on a memorandum entitled "North American Investment Properties, LLC Confidential Private Placement Memorandum."  *See* Confidential Private Placement Memorandum (ECF No. 138).  This memorandum was prepared by NAIP for the use of potential investors of the property.  The memorandum provides that NAIP is offering ten investment units of the property for sale, with each representing a 8.33% membership in NAIP, at a cost of $25,000 per unit.  The pertinent section of the memorandum is found on page four.  Perplexingly, the document contains two pages marked "Page 4," both containing mostly the same content, except that the specific provision that is relevant for the present purposes is entirely omitted on the second "Page 4."  The first "Page 4" contains the following content:

> After acquiring the real estate, [NAIP] will donate a portion of the property to the Hidya Islamic Community Center.  *In addition, five acres of the property will be donated to the Michigan Islamic Academy, either by [NAIP] directly or by the Hidya Islamic Community Center.*

21

*Id.* (Page ID 5420) (emphasis added).  The italicized sentence is omitted from the second "Page 4," and MIA does not explain the omission.  *Id.* (Page ID 5421). Even assuming that the first "Page 4" is the operative "Page 4" of the memorandum, the italicized sentence does not confer on MIA an interest in the property.  The italicized sentence merely informs potential investors that five acres of property will be donated to MIA; it does not purport to actually convey the interest.   Moreover, even if the italicized language could be construed as conveying an interest in the property to MIA, the memorandum is not signed by the then-owner of the property (Said) or even by one of its future owners (NAIP or HMCA); it fact, the memorandum is not signed by anyone at all.   The memorandum does not convey an interest in the property to MIA.

MIA  also  relies  on  the  Pittsfield  Township  "Petition  for  Zoning Amendment" that it filed on December 6, 2010, requesting that the Township rezone the property.  *See* Petition for Zoning Amendment (ECF No. 136).  The petition contains an "applicant affidavit," requiring the signature of the party requesting rezoning, and a separate "owner affidavit," requiring the signature of the owner of the property.  Tarek Nahlawi signed the "applicant affidavit" on behalf of MIA, and Issa Said signed the "owner affidavit" on behalf of NAIP.[10] MIA argues that the petition suggests that "the deed holders, at all times,

---

[10] Contrary to Said's representation, NAIP did not own the property at the time; rather, Said owned it.

22

authorized [MIA] to proceed with the application, and . . . with the development of the property."  MIA Resp. Br. at 92 (ECF No. 185 Page ID 8040).  However, the issue is not whether the property owner recognized MIA's right to utilize the property.  Rather, the issue is whether the property owner conveyed some legally cognizable interest in the property to MIA.  The Petition for Zoning Amendment does not convey to MIA any interest in the property.

In sum, MIA has not offered any evidence showing that it has, or ever had, a legally cognizable interest in the property.  In the briefing on this issue, MIA conflates two issues, one of which is relevant and the other irrelevant.  The first issue, the irrelevant one, is whether MIA had permission in a colloquial sense to utilize the property.  It clearly did.  The evidence offered by MIA and discussed above shows that the owners of the property gave MIA permission to proceed with its building project on their land.  The second issue, the relevant one, is whether the law of the State of Michigan recognizes as a property interest the permission that MIA has been granted to use the property.  This second issue is the relevant one, and not the first, because the RLUIPA claims asserted by MIA require a showing that the Township imposed a "land use regulation," and a "land use regulation" is a legal term requiring MIA to show that it has some interest in the property that is *recognized* by the State of Michigan.  MIA has offered no evidence indicating that it has a legally cognizable interest in the property, even if it does

23

have the explicit informal permission of the land owner to proceed with its plan to build a school.  Notably, Tarek Nahlawi confirmed that, as of February 19, 2014, the date of his deposition, no part of the property had actually been donated to MIA.  Nahlawi Dep. at 36 (ECF No. 128 Page ID 4982).

Although the parties do not raise the issue, the Court notes that the permission granted to MIA to utilize the property here may constitute a license. "A license grants permission to be on the land of the licensor without granting any permanent interest in the realty." *Forge v. Smith*, 458 Mich. 198, 210, 580 N.W.2d 876, 883 (1998).  However, the Michigan Supreme Court has held that "[licenses] are not considered interests in land." *Id.*  Moreover, a license has been held to constitute an insufficient property interest under RLUIPA's definition of "land use regulation." *See E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 540-41 (E.D.N.Y. 2011) (concluding that plaintiffs, who were granted a revocable license to use the subject land, held an insufficient property interest under RLUIPA's definition of "land use regulation").

The Court also notes that this case is distinguishable from *DiLaura v. Ann Arbor Charter Township*, 30 F. App'x 501 (6th Cir. 2002).  The RLUIPA claimants there wanted to use a house as a religious retreat, hosting several guests per week for the purposes of prayer and fellowship.  An issue was whether one of the claimants held a sufficient interest in the property under RLUIPA's definition

24

of "land use regulation."   Although the claimant did not own the property, the owner of the property agreed to donate the land to the claimant if the property could be used for religious purposes.   Importantly, the donation agreement between the owner and the claimant was memorialized in a writing that was signed by the owner.   *Id.* at 503.   Under these circumstances, the Sixth Circuit held that the claimant's interest in the property, although contingent, was sufficient under RLUIPA.   *Id.* at 507.   *DiLaura* is factually distinguishable from the present case because, while the claimant in *DiLaura* held an interest in the land that was cognizable under the law, the same is not true here.

For these reasons, the Court must grant summary judgment in favor of the Township with regard to MIA's three remaining RLUIPA claims.   Therefore, MIA's motion for partial summary judgment seeking summary judgment on one of those claims will be denied.   However, judgment will be entered in favor to the Township on the RLUIPA claims without prejudice to either (1) MIA's ability to reassert the claims should it acquire a legally cognizable interest in the property, or (2) the ability of another person or entity with a legally cognizable interest in the property to assert the claims.   The statute of limitations governing any potential assertion or reassertion of the RLUIPA claims will be deemed tolled during the pendency of the present action from February 22, 2012 until today, and preclusion

principles shall not present an impediment to the ability of MIA or another person/entity from asserting or reasserting the RLUIPA claims.

## B. RLUIPA and Constitutional Claims

The Township argues that MIA's constitutional claims, along with its RLUIPA claims, are unripe because the Township's zoning authorizes have not reached a final decision regarding the application of the zoning regulations to the property.[11] The Township asserts three theories in support of its argument. First, it claims that its decision is not final because MIA was required to seek a variance from the Zoning Board of Appeals after the Township Board of Trustees denied MIA's rezoning petition.[12] Second, the Township argues that it did not reach a final decision on MIA's rezoning request because MIA failed to appeal to the Zoning Board of Appeals the decision of the Township Board of Trustees denying

---

[11] MIA's constitutional claims are brought under the Establishment and Equal Protection Clauses of the United States Constitution, and their analogs under the Michigan Constitution. Michigan courts interpreting Michigan's version of the Establishment and Equal Protection Clauses apply the same legal standards as federal courts interpreting those Clauses under the federal Constitution. *See Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Twp.*, 486 Mich. 311, 318, 783 N.W.2d 695, 697 (2010); *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 301 (6th Cir. 2009).

[12] The Zoning Board of Appeals is the body tasked with adjudicating variance requests. *See* Mich. Comp. Laws § 125.3604; Township Zoning Ordinance § 60.04 (ECF No. 111-12 Page ID 3216). It also hears appeals from decisions of the Zoning Administrator. Township Zoning Ordinance §§ 60.07, 60.08 (ECF No. 111-12 Page ID 3220-21). The role of the Zoning Administrator is discussed in more detail below.

MIA's petition for a zoning amendment.  Finally, the Township argues that MIA was required to seek a decision from the Zoning Administrator on whether MIA was required to submit a petition to amend the PUD and whether MIA's proposed school constitutes a "small-scale school" that would be permitted on the property as it is presently zoned.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, 123 S. Ct. 2026, 2030 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 1515 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977)).  "Haste makes waste, and the premature adjudication of legal questions compels courts to resolve matters, even constitutional matters, that may with time be satisfactorily resolved at the local level, and that may turn out differently in different settings."  *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010) (citations and internal quotation marks omitted).

"To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute 'fit' for

27

a court decision in the sense that it arises in 'a concrete factual context' and involves 'a dispute that is likely to come to pass'? and (2) what are the risks to the claimant if the federal courts stay their hand?"  *Id.* (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008)).  In the context of a land-use case such as this one, the first question boils down to whether "the relevant administrative agency resolve[d] the appropriate application of the zoning ordinance to the property in dispute" or, phrased differently, whether "'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue,'" *id.* at 537-38 (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S. Ct. 3108, 3116 (1985)), and the second question focuses on whether the land-use plaintiff has "shown that it will suffer any hardship by delaying a federal court decision until the zoning [authorities] act[]." *Id.* at 538. This ripeness inquiry applies not only to RLUIPA claims, but also to constitutional challenges to land-use requirements.  *See id.* at 537; *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 618 (6th Cir. 2008).

The Township first asserts that MIA's claims are unripe because MIA was required to seek a variance from the Zoning Board of Appeals after the Township Board of Trustees, adopting the recommendation of the Planning Commission, denied MIA's rezoning petition. *See Seguin v. City of Sterling Heights*, 968 F.2d

28

584, 587 (6th Cir. 1992) ("[A] zoning determination cannot be deemed final until the plaintiffs have applied for, and been denied, a variance.").   However, the Township does not clarify what type of variance it thinks MIA should have sought and why.   Although two kinds of variances – "use" and "nonuse" – are recognized under Michigan law, *see generally* Mich. Comp. Laws § 125.3604, the Township Zoning Ordinance authorizes only nonuse variances:

> The Board of Appeals shall have the power and duty to authorize . . . such nonuse variances from the provisions of this ordinance. . . . Under no circumstances shall the Board of Appeals grant a variance to allow a use not permissible under the terms of this ordinance in the district involved.

Township Zoning Ordinance § 60.04 (Page ID 3216, 3218).   *See also id.* § 2.02 (Page ID 2978) (defining "variance" as "a relaxation of the terms of the zoning ordinance where such variance will not be contrary to the public interest and where . . . a literal enforcement of the ordinance would result in unnecessary and undue hardship," but cautioning that "a variance is authorized only for height, area and size of yards and open spaces and parking space; establishment or expansion of a use otherwise prohibited shall not be allowed by variance.").[13]   The Township does not explain how a nonuse variance, the only type of variance available under the

---

[13]  Under Michigan law, local government units such as the Township are not required to entertain requests for use variances: "The authority to grant use variances . . . is permissive, and this section does not require a local unit of government to adopt ordinance provisions to allow for the granting of use variances."  Mich. Comp. Laws § 125.3604(11).

Township Zoning Ordinance, could help MIA and provide it with relief from the decision of the Township Board of Trustees to deny MIA's rezoning petition. Accordingly, MIA was not required to seek a variance to ripen its claims. *See Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005) ("A property owner . . . will be excused from obtaining a final decision if . . . seeking a variance would be futile. That is, a property owner need not pursue [a variance] when a zoning agency lacks discretion to grant variances."). Here, the Zoning Board of Appeals lacked authority to grant MIA the kind of variance it needed to obtain what it desired. MIA did not have to needlessly seek the unobtainable.

Second, the Township argues that it did not reach a final decision on MIA's rezoning request, and therefore the claims asserted in this lawsuit are not ripe, because MIA failed to appeal to the Zoning Board of Appeals the decision of the Township Board of Trustees denying MIA's petition for a zoning amendment. As MIA correctly points out, however, the Zoning Board of Appeals lacks authority to review the decision of the Township Board of Trustees denying a petition for zoning amendment. Petitions seeking an amendment to a PUD are governed by §§ 52.12 and 52.07 of the Township Zoning Ordinance, which together provide that major amendments are decided by the Township Board of Trustees following a study by the Planning Commission. Michigan's Zoning Enabling Act provides that "an appeal [of a PUD decision] may be taken to the zoning board of appeals

30

only if provided for in the zoning ordinance," Mich. Comp. Laws § 125.3603(1), and the Township Zoning Ordinance does not authorize such an appeal. Because finality does not require MIA to pursue relief that is not available to it under the pertinent zoning regulations, MIA's failure to appeal the decision of the Township Board of Trustees denying MIA's rezoning petition does not render the claims brought in this lawsuit unripe.

Finally, the Township argues that, to ripen its claims, MIA was required to seek a decision from the Zoning Administrator on whether MIA was required to file a petition to amend the PUD and whether MIA's proposed school constitutes a "small-scale school" that would be permitted on the property as presently zoned. As discussed, MIA's position is that its proposed school constitutes a "small-scale school" and that, because the property is already zoned to permit such a school, it should not have been required to file a petition to amend the PUD.

Under the Township Zoning Ordinance, "all questions of interpretation and enforcement [of the ordinance] shall first be presented to the Zoning Administrator, and . . . shall be presented to the Board of Zoning Appeals . . . on appeal from the decisions of the Zoning Administrator." Township Zoning Ordinance § 60.08 (Page ID 3220). Whether MIA was required to pursue an amendment to the PUD is an issue that was never resolved by the Township's zoning authorities; it appears to be an issue of "interpretation and enforcement"

31

falling within the authority of the Zoning Administrator, subject to review by the Zoning Board of Appeals. Moreover, if it is determined that MIA was not required to pursue an amendment to the PUD, the issue then arises whether MIA's proposed school qualifies as a "small-scale school," which is an issue of interpretation that the Zoning Administrator has exclusive authority to resolve, subject to review by the Zoning Board of Appeals. *See* Township Zoning Ordinance § 60.08 (Page ID 3220-21) ("It is the intent of this ordinance that all questions of interpretation . . . shall first be presented to the Zoning Administrator, and that such questions shall be presented to the Board of Appeals . . . on appeal. . . . It is further the intent of this ordinance that the duties of the Township Board . . . shall not include hearing and deciding questions of interpretation . . . that may arise.").

The question is: Under the ripeness doctrine, was MIA required to seek a decision from the Zoning Administrator regarding the issues discussed in the preceding paragraph prior to bringing this lawsuit? The Sixth Circuit's decision in *Miles Christi* is instructive.

The RLUIPA land-use claimant in *Miles Christi* was a religious order conducting services and Bible study sessions in a house that it owned in a residential neighborhood. 629 F.3d at 535. After neighbors complained to the township about parking congestion at the house, the township investigated and informed the order that it would need to seek a variance to allow for additional

parking and submit a site plan detailing the intended expansion, as it was determined that the home was being used in a more intensive way than residential zoning permits. *Id.* at 535-36. When the order failed to submit a site plan, as instructed, it was issued a ticket for violating the township's zoning ordinance, prompting it to file a lawsuit in federal court alleging violations of RLUIPA and the First Amendment's Free Exercise Clause. *Id.* at 536. The district court dismissed the case as unripe, concluding that the township had not reached a final decision on whether the zoning ordinance required the order to submit a site plan under the circumstances, because the order failed to appeal the township's demand for a site plan to the township's zoning board of appeals, as permitted under the township's zoning ordinance. *Id.* at 537.

The Sixth Circuit affirmed the district court's ripeness determination. In doing so, the court reiterated that a ripeness determination in the context of a land-use case requires consideration of two questions: (1) has "the relevant administrative agency resolve[d] the appropriate application of the zoning ordinance to the property in dispute," and (2) will the claimant "suffer any hardship by delaying a federal court decision until the zoning board acts"? *Id.* at 537-38. Regarding the first question, the court determined that the township's zoning ordinance authorized an appeal to the township's zoning board of appeals of both the township's determination that the house was being put to more

intensive use than permitted for residential zoning and its demand that the order submit a site plan. *Id.* at 538. The court held that "[f]inality requires the input of the zoning board on these unresolved questions." *Id*. Regarding the second question, the court held that an appeal to the zoning board of appeals could only further the order's goals, and could not hurt the order, because the appeals board "may give the order the very relief it seeks: the chance to live and serve the Northville community without further inquiries." *Id.*

*Miles Christi* counsels in favor of holding that the claims that remain in this lawsuit are unripe. Regarding the first consideration of the *Miles Christi* framework, whether MIA received a final decision about the application of the Township Zoning Ordinance to the property, the Township's position is final as to one potential avenue to achieving the result desired by MIA but not final as to another potential avenue – the one that MIA believes is the only appropriate avenue. That is, the Township's decision denying MIA's petition to amend the PUD is final, as that decision is not reviewable following denial by the Township Board of Trustees. However, MIA's position is that the Township Zoning Ordinance did not require it to seek an amendment of the PUD in the first place because a "small-scale school" is permitted on the property as it is currently zoned, and MIA's proposed school qualifies as a "small-scale school." The Township's decision on this issue – whether the current zoning of the property even needed to

34

be changed in order to accommodate the contemplated school – is unknown. This is because MIA never attempted to put that interpretative issue before the appropriate zoning body, which is the Zoning Administrator, whose decision would be subject to review by the Zoning Board of Appeals.[14]

The second consideration of the *Miles Christi* framework is whether MIA will suffer a hardship by delaying a decision in this case until the Zoning Administrator and/or Zoning Board of Appeals reaches a final decision on whether MIA's contemplated school is an appropriate use of the property as it is currently zoned. MIA mentions no hardship and the Court can discern none. Like the religious order in *Miles Christi*, MIA may yet obtain the relief it seeks from the

---

[14] As discussed, as part of the analysis of one of the eleven requirements for a PUD amendment (i.e., whether MIA's proposed school conformed to the general development plan, which allows "small-scale schools"), the Planning Commission and Township Board of Trustees concluded that MIA's proposed school did not qualify as a "small-scale school." However, the Planning Commission and Township Board of Trustees did not seek input from the Zoning Administrator with regard to the interpretation of that term, even though the Township Zoning Ordinance places "questions of interpretation" within the exclusive authority of the Zoning Administrator. Instead, the Planning Commission applied its own definition of the term – one with which some of the Commissioners agreed while others disagreed, and one that conflicted with the definition proposed by MIA – even as one of the Commissioners commented that she "would like to see a definition of small scale." 8/4/11 Meeting Minutes (ECF No. 110-15 Page ID 2652). Regardless of whether the Planning Commission had authority to interpret the term as part of its analysis of an issue properly before it (i.e., whether MIA's proposed school conformed to the general development plan), its definition would not be binding on the governmental unit with exclusive authority under the Township Zoning Ordinance to resolve "questions of interpretation."

Township – the ability to build its school on the property – by pursuing its theory that the property is already appropriately zoned for the contemplated use.  Pursuing this avenue to MIA's goal could only help MIA; if MIA is successful before the Zoning Administrator/Zoning Board of Appeals, it will have obtained the result it seeks – the ability to build its school.  If it is unsuccessful, MIA may return promptly to this Court and the litigation will resume where it left off.

MIA argues that forcing it to pursue additional relief before the Township's zoning authorities would be futile because the result would be the same.  *See Murphy*, 402 F.3d at 349 ("A property owner . . . will be excused from obtaining a final decision if . . . . [the] zoning agency . . . has dug in its heels and made clear that all such applications will be denied.").  However, MIA does not articulate why it believes this to be the case other than to argue that the decision of the Planning Commission and Township Board of Trustees to deny MIA's petition was "facially unreasonable" and there is no reason to believe the Township would treat it fairly should it be required to pursue additional relief.  MIA Br. at 99 (ECF No. 185 Page ID 8047).  The Court acknowledges MIA's argument.[15]  However, the Court notes

---

[15] The Court specifically notes the troubling behavior of Planning Commissioner Deborah Williams, whose tiebreaking vote to recommend denial of MIA's petition mattered.  The Court also notes the collective reaction of members of the public, some of whom spoke at the various hearings on MIA's petition and may have influenced the recommendation of the Planning Commission, to an off-color comment made during the Planning Commission's June 16, 2011 meeting.

that the Zoning Administrator and the members of the Zoning Board of Appeals, on the one hand, are not the same as the members of the Planning Commission and the members of the Township Board of Trustees, on the other hand.[16]   Therefore, even if unlawful animus toward Islam played a role in the decisionmaking process of the Planning Commission and Township Board of Trustees, there is no reason to believe the same would be true of the decisionmaking process of the Zoning Administrator and the Zoning Board of Appeals.

For these reasons, the Court concludes that MIA's claims under the Establishment and Equal Protection Clauses, along with its RLUIPA claims, are presently unripe.   To ripen the claims, MIA must obtain a final determination of the Zoning Administrator/Zoning Board of Appeals as to whether the proposed school can be built on the property as it is presently zoned.

## V. CONCLUSION

For the reasons stated above, the Township's motion for summary judgment is **GRANTED** subject to the following caveats.   First, MIA's RLUIPA claims may

---

Certainly, a reasonable jury could conclude from this evidence that the denial of MIA's rezoning petition stemmed, at least to some extent, from unlawful animus.

[16] There appears to be one exception: George Ralph is presently on both the Planning Commission and the Zoning Board of Appeals.   However, Ralph was one of the two Planning Commissioners who did not attend the meeting during which the Planning Commission recommended denial of MIA's petition, and his views on the petition are therefore unknown.   8/4/11 Meeting Minutes (ECF No. 110-15 Page ID 2661-62).

be reasserted by MIA should it acquire a legally cognizable interest in the property, or asserted by another person or entity with a legally cognizable interest in the property. Second, MIA's RLUIPA and constitutional claims may be reasserted after MIA obtains a final decision from the Zoning Administrator/Zoning Board of Appeals with regard to whether MIA may build its school on the property as it is presently zoned. The statute of limitations governing any potential assertion or reassertion of MIA's claims will be deemed tolled during the pendency of the present action. MIA need not file a new lawsuit should it wish to reassert the claims brought in this lawsuit; it may simply file on the present docket a motion to reopen the case. Should some or all of the claims be brought by a person or entity other than MIA, an amended complaint naming the new plaintiff(s) should be filed together with the motion to reopen.

MIA's motion for partial summary judgment is **DENIED WITHOUT PREJUDICE**. The Township's motion to limit damages is **DENIED WITHOUT PREJUDICE AS MOOT**.

Date: March 20, 2015

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Gadeir I. Abbas, Esq.
Lena F. Masri, Esq.
Thomas R. Meagher, Esq.
David Yerushalmi, Esq.
Robert J. Muise, Esq.

38